Cesar A. PERALES, as Commissioner of the New York State Department of Social Services; New York State Department of Social Services; Robert Abrams, as Attorney General of the State of New York, and on behalf of the People of the State of New York; State of New York; City of New York; Sara Doe; Jane Roe; Anne Coe, individually and on behalf of their minor children, and on behalf of all others similarly situated and their minor children, Plaintiffs–Appellants,

Fran Foe; Mary Moe; Linda Loe; Susan Soe; Zelda Zoe, individually and on behalf of their minor children, and on behalf of all others similarly situated and their minor children, Plaintiffs–Intervenors–Appellants,

v.

Janet RENO, as Attorney General of the United States; Terrance O'Reilly, as Assistant Commissioner for Administrative Appeals Unit of the Immigration and Naturalization Service; William R. Yates, as Eastern Service Center Director of the INS Eastern Division; William S. Slattery, as INS District Director of the New York District; Donna E. Shalala, as Secretary of Health and Human Services, Defendants–Appellees.

Nos. 253, 254, 255, Dockets 91–6133, 91–6135, 91–6167.

United States Court of Appeals, Second Circuit.

Argued May 24, 1994.

Decided Feb. 8, 1995.

Stephen Loffredo, Janet Calvo, Main Street Legal Services Inc., Flushing, NY, Paul A. Crotty, Corp. Counsel to the City of New York, New York City, Pamela Seider Dolgow, Linda H. Young, of counsel; G. Oliver Koppell, Atty. Gen., of the State of New York, New York City, Judith Kramer, Asst. Atty. Gen., for plaintiffs-appellants.

Diogenes P. Kekatos, Asst. U.S. Atty., for the S.D. of N.Y. (Mary Jo White, U.S. Atty. for the S.D. of N.Y., Marla Alhadeff, Asst. U.S. Atty. for the S.D. of N.Y. of counsel), for defendants-appellees.

Before: CARDAMONE, WALKER, and McLAUGHLIN, Circuit Judges.

WALKER, Circuit Judge:

This class action was brought to challenge the Immigration and Naturalization Service's administration of the amnesty program for eligible illegal aliens authorized by the Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. No. 99–603, 100 Stat. 3359 *et seq.* Plaintiffs alleged that the agency's regulations implementing the statutory exclusion of aliens "likely at any time to become a public charge" were facially invalid, *see* 8 U.S.C. § 1182(a)(4) (Supp. II 1990); that the agency failed to "broadly disseminate" eligibility criteria and to sponsor a twelve-month application period as required by IRCA, *see* 8 U.S.C. § 1255a(i); and that the agency violated the class members' due process rights under the Fifth Amendment. In a previous opinion, we held that the "public charge" regulations violated IRCA and therefore did not address plaintiffs' arguments as to the INS's dissemination policies or alleged due process violations. *Perales v. Thornburgh*, 967 F.2d 798 (2d Cir.1992). The Supreme Court subsequently vacated our decision and remanded for further consideration in light of *Reno v. Catholic Social Services*, —— U.S. ——, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) ("*CSS*").

Although we initially remanded this case to the district court for further consideration of the facial validity challenge in light of *CSS*, *Perales v. Thornburgh*, 4 F.3d 99 (2d Cir. 1992), both parties petitioned for us to recall our mandate and rule on that part of the former appeal that was not addressed in our prior opinion. We granted their petitions and now hold that the INS complied with its duties under IRCA and the Due Process Clause of the Fifth Amendment to disseminate accurate information broadly regarding the amnesty legalization program and to sponsor a twelve-month application period. Accordingly, we affirm that part of the district court's judgment that reached a similar conclusion and reissue our remand for further consideration of the plaintiffs' challenge to the validity of the public charge regulations.

## BACKGROUND

The amnesty program established by IRCA was developed as a one-time opportunity to legalize "undocumented aliens who, over the years, had shown their capacity to be contributing members of society" but who had not obtained legal status during their residency. 967 F.2d at 801. It was instituted at the same time that Congress "undercut the incentives for illegal immigration by sanctioning employers who hire undocumented workers." *Id.* Our previous opinion in this case set forth the necessary background regarding the provisions of the amnesty program and the INS's adoption and development of the public charge regulations at issue. Because our current decision relies on the same record, we think it appropriate to set forth the relevant sections of our previous background section here. They are as follows:

### A. The Amnesty Provisions.

Amnesty [under IRCA] was to take place in two stages. During a twelve-month period beginning "on a date ... designated by the Attorney General" and later established by regulation as May 5, 1987 through May 4, 1988 (the "application period"), illegal aliens could apply to the INS for temporary resident status. 8 U.S.C. § 1255a(a)(1) (1988). The second stage, to commence nineteen months after the receipt of temporary resident status, gave aliens one year, later extended to two, *see* Pub.L. No. 101–649, § 703(a), 104 Stat. 4978, 5086 (1990), in which to apply for permanent resident status. 8 U.S.C. § 1255a(b)(1)(A), 2(C) (1988 & Supp. II 1990). Aliens could tender their applications to the INS or to Qualified Designated Entities ("QDEs"), nongovernmental agencies enlisted to serve as "buffers" between aliens and the government. *See* 8 U.S.C. § 1255a(c)(1) (1988). IRCA further required the INS, in conjunction with the QDEs, to "broadly disseminate information respecting the benefits which aliens may receive under this section and the requirements to obtain such benefits." 8 U.S.C. § 1255a(i) (1988).

IRCA conditioned adjustment to temporary resident status on the meeting of four broad eligibility requirements. Sections

1255a(a)(1)–(4) mandated the Attorney General to grant this adjustment of status where the applicant: (1) had filed a timely application; (2) had maintained continuous unlawful residence since 1982; (3) had maintained a continuous physical presence since November 6, 1986; and (4) was "admissible to the United States as an immigrant." 8 U.S.C. § 1255a(a)(1)–(4) (1988).

The current appeal centers on the fourth criterion: admissibility as an immigrant. To show that she was "admissible ... as an immigrant," 8 U.S.C. § 1255a(a)(4) (1988), an alien had to establish, *inter alia*, that she was not inadmissible under 8 U.S.C. § 1182(a)(4) (Supp. II 1990) pursuant to which "[a]ny alien who, in the opinion of the ... Attorney General at the time *of application for admission or adjustment of status,* is likely at any time to become a public charge is excludable." IRCA's "Special Rule for Determination of Public Charge" (the "statutory special rule") limited the agency's broad discretion in this area, stating that an alien "is not ineligible for adjustment of status under this section due to being inadmissible under section 1182(a)(4) of this title [relating to the public charge determination] if the alien demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance." 8 U.S.C. § 1255a(d)(2)(B)(iii) (Supp. II 1990). In a separate provision, IRCA authorized the Attorney General to waive "in the case of individual aliens" any of the excludability provisions of § 1182(a), including the

public charge provision, "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." 8 U.S.C. § 1255a(d)(2)(B)(i).

### B. *The INS' May 1, 1987 Public Charge Regulations.*

Pursuant to these provisions, the INS promulgated final regulations on May 1, 1987, 52 Fed.Reg. 16,205 *et seq.* (1987) (codified as amended at 8 C.F.R. § 245a (1992)). The INS broke the statutory amnesty scheme down into three parts. First, the agency's "Proof of financial responsibility" regulation mirrored the statutory language by providing that "[a]n applicant for adjustment of status ... [is] likely to become [a] public charge[ ] unless the applicant demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance." 52 Fed.Reg. 16,211 (1987) (codified as amended at 8 C.F.R. § 245a.2(d)(4) (1992)).[1] Integral to this provision was the regulation's definition of "public cash assistance" as "income or needs-based monetary assistance ... received by the alien or his or her immediate family members through federal, state or local programs designed to meet subsistence levels." 52 Fed.Reg. 16,209 (1987) (codified as amended at 8 C.F.R. § 245a.1(i) (1992)).[2] The third element, entitled "Special Rule for Determination of Public Charge" (the "regulatory special

---

1. The provision stated:
   (4) Proof of financial responsibility. An applicant for adjustment of status under this part is subject to the provisions of section 212(a)(15) of the Act relating to excludability of aliens likely to become public charges unless the applicant demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance. Generally, the evidence of employment submitted under paragraph (d)(3)(i) of this section will serve to demonstrate the alien's financial responsibility during the documented period(s) of employment. If the alien's period(s) of residence in the United States include significant gaps in employment or if there is reason to believe that the alien may have received public assistance while employed, the alien may be required to provide proof that he or she has not received public cash assistance. An appli-

cant for residence who is likely to become a public charge will be denied adjustment.

2. This provision stated in full:
   "Public cash assistance" means income or needs-based monetary assistance, to include but not limited to supplemental security income, received by the alien or his or her immediate family members through federal, state, or local programs designed to meet subsistence levels. It does not include assistance in kind, such as food stamps, public housing, or other non-cash benefits, nor does it include work-related compensation or certain types of medical assistance (Medicare, Medicaid, emergency treatment, services to pregnant women or children under 18 years of age, or treatment in the interest of public health). 52 Fed.Reg. 16209 (1987).

rule") provided in relevant part that "[a]n alien who has a consistent employment history which shows the ability to support himself and his or her family ... may be admissible" through a discretionary waiver from the Attorney General. 52 Fed.Reg. 16,212 (1987) (codified as amended at 8 C.F.R. § 245a.2(k)(4) (1992)).[3]

### C. *Developments in INS Policy.*

Prior to the issuance of the May 1, 1987 regulations, groups representing aliens had commented that the proposed public charge regulations unlawfully conditioned a showing of self-support upon the non-receipt of public assistance by family members. Just over four months into the application period, the INS began a series of "clarifications" and amendments of the public charge provisions. A September 23, 1987 memorandum from Associate Commissioner Norton to the four regional commissioners removed the regulatory special rule's waiver requirement, stating that "[n]o waiver application is necessary to apply the special rule for determination of public charge." Commissioner Norton repeated this instruction in an October 1, 1987 letter to Edward J. Wildblood, the Regional Legalization Officer of the Eastern Regional Office. On November 17, 1987, the INS formalized this policy, issuing a technical amendment that deleted the waiver requirement from its special rule. 52 Fed.Reg. 43,843 (Nov. 17, 1987) (codified at 8 C.F.R. § 245a.2(k)(4) (1992)).

The INS also revised its definition of "public cash assistance." A November 23, 1987 memorandum from Commissioner Norton to the four regional commissioners explained that "SSI [Supplemental Security Income] should be considered as public cash assistance only with regard to the person who receives it. SSI should not be attributed as public cash assistance to the immediate family members who reside with the recipient, but who themselves are non-recipients." The agency's position with respect to Aid to Families with Dependent Children (AFDC) developed more slowly. A December 9, 1987 memorandum from Paul Virtue, INS General Counsel, to Terry O'Reilly, Deputy Assistant Commissioner for Legalization, explained that

> if a family of three applied for AFDC and the parents were both ineligible aliens the benefit would still be granted to the United States Citizen child and that the child is considered the recipient.... For our purposes, it would seem to me that the parents in such a situation would not be considered to have received "public cash assistance".

In a February 12, 1988 letter responding to questions from a District of Columbia Official, Assistant Commissioner William Slattery indicated that "[p]ublic charge status is not conveyed to the parent-payee if the United States citizen child is the recipient [of AFDC]." Finally, on April 21, 1988, just two weeks before the close of the application period, Commissioner Norton adopted this position in a memorandum to the four Regional Commissioners:

> As a general rule, the receipt of AFDC benefits by a member of the legalization applicant's family is not attributed to the applicant for purposes of determining the likelihood that the applicant will be-

---

**3.** The regulatory special rule provides that:

(4) *Special rule for determination of public charge.* An alien who has a consistent employment history which shows the ability to support himself and his or her family, even though his income may be below the poverty level, may be admissible under paragraph (k)(2) of this section [providing for waivers for humanitarian purposes, to assure family unity, or when in the public interest]. The alien's employment history need not be continuous in that it is uninterrupted. It should be continuous in the sense that the alien shall be regularly attached to the workforce, has an income over a substantial period of the applicable

time, and has demonstrated the capacity to exist on his or her income and maintain his or her family without recourse to public cash assistance. This regulation is prospective in that the Service shall determine, based on the alien's history, whether he or she is likely to become a public charge. Past acceptance of public cash assistance within a history of consistent employment will enter into this decision. The weight given in considering applicability of the public charge provisions will depend on many factors, but the length of time an applicant has received public cash assistance will constitute a significant factor. 52 Fed.Reg. 16,212 (1987).

come a public charge.... If, however, the family is reliant on the AFDC benefits as its sole means of support, the legalization applicant may be considered to have received public cash assistance. This determination must be made on a case-by-case basis and upon consideration of the totality of the applicant's circumstances.

Following the May 4, 1988 close of the application period, in a written decision dated December 29, 1988, Commissioner Norton broadened the April 21, 1988 position. He held that even a non-working applicant whose children had received public cash assistance would not be excludable as likely to become a public charge, since

[i]t is not unusual for a mother to stay at home to care for her children, especially when the children have not started school. A mother's absence from the work force to care for her children is not by itself sufficient basis to find the mother likely to become a public charge.

*Matter of A.*, Interim Decision No. 3097 at 4 (Imm. Nat. Serv. Dec. 29, 1988). Finally, in July of 1989, more than one year after the May 5, 1988 application cutoff date, the INS formally amended its regulatory definition of "public cash assistance" to delete all reference to the alien's immediate family members. The Federal Register notice explained that "[t]he receipt of public cash assistance by immediate family members will not have a bearing on an applicant's eligibility for legalization." 54 Fed.Reg. 29,442, 29,443 (1989).

The July 1989 amendments also removed from the regulatory special rule references to an alien applicant's family. From that point on "an applicant need[ed] only [to] demonstrate a consistent employment history that shows the ability to support himself or herself." *Id.* at 29,443–44.

967 F.2d at 801–04.

Because a full recitation of the procedural history of this litigation is not necessary to our current decision, we briefly summarize only the central events in this lawsuit. Our prior opinion contains a more complete description. 967 F.2d at 804–05.

This lawsuit was commenced on April 1, 1988 by the State of New York, the City of New York, and a class of plaintiffs later certified as

[a]ll undocumented aliens residing in New York State who may be excludable from the Legalization Program established by IRCA as "likely to become public charges" under the standards set forth in INS regulations 8 C.F.R. §§ 245a.1(i), 245a.2(d)(4) and 245a.2(k)(4) based in whole or in part upon the receipt of public cash assistance by the applicant's U.S. citizen or legal permanent resident family members, including but not limited to those individuals who were deterred from filing applications for legalization under the Legalization program.

Plaintiffs asserted that the public charge regulations facially violated IRCA, the Fifth Amendment's Equal Protection Clause, and the Administrative Procedure Act's proscription against arbitrary and capricious action because they included consideration of public assistance by an alien's family members in determining whether the alien herself was self-supporting. Plaintiffs further alleged that the INS failed to "broadly disseminate" complete and accurate information regarding the public charge regulations and that this failure violated the class members' due process rights and the INS's duty to administer a full twelve-month application period. *See* 8 U.S.C. §§ 1255a(a), 1255a(i).

In early April, 1988, plaintiffs applied for a temporary restraining order directing the INS to disseminate its revised policy that a child's receipt of public cash assistance does not convey public charge status to the parent. The district court denied the application based on the INS's assertion that it would disseminate new instructions on this issue, which it did through the April 21, 1988 memorandum to the four regional commissioners referenced above. Dissatisfied with this action, plaintiffs immediately applied for a preliminary injunction to extend the application period, which the district court denied. We subsequently affirmed this denial. *Perales v. Meese*, 847 F.2d 55 (2d Cir.1988).

On March 29, 1989, the district court denied the parties' cross-motions for partial

summary judgment. Upon plaintiffs' filing of a motion for reargument, the parties entered into a Stipulation and Order, filed July 21, 1989, which required defendants to publish amended regulations deleting the references to family members from the definition of public cash assistance and from the regulatory special rule and to readjudicate all timely filed applications that had been denied on public charge grounds. The INS thereupon issued the July, 1989 amendments discussed above and readjudicated the pertinent applications, approving all but one.

After holding a six-day bench trial, the district court issued the opinion currently under review, which held that the INS public charge regulations were neither facially invalid nor unlawful as applied. *Perales v. Thornburgh*, 762 F.Supp. 1036, 1061 (S.D.N.Y.1991). The district court also rejected plaintiffs' claim that the INS disseminated misinformation concerning the public charge regulations in violation of IRCA and the Fifth Amendment's Due Process Clause. *Id.* at 1064–65.

On appeal, we held that the public charge regulations violated IRCA for two reasons: the regulatory special rule required an applicant to demonstrate the ability to support her family as well as herself and further required an applicant who satisfied the regulatory special rule to apply for a discretionary waiver from the Attorney General. 967 F.2d at 808–10. We found that there was no support in IRCA for either requirement. Under the statute, an applicant needed only to demonstrate evidence of self-support to satisfy the statutory special rule and, upon doing so, was exempt from public charge excludability without having to undergo an additional waiver process. We ordered the INS to disseminate information regarding the effect of our decision and to sponsor a new twelve-month application period for class members who had been dissuaded from applying for amnesty during the original application period because of the unlawful regulations. *Id.* at 813–14. Given this holding, it was unnecessary for us to address plaintiffs' dissemination and due process claims.

In June, 1993, the Supreme Court vacated our opinion and remanded the case for further consideration in light of *CSS*. *Reno v. Perales*, —— U.S. ——, 113 S.Ct. 3027, 125 L.Ed.2d 716 (1993). *CSS* held that aliens challenging regulations promulgated pursuant to IRCA (in that case, regulations regarding the "continuous residence" and "continuous physical presence" requirements) were required to show that their claims were ripe by demonstrating that they had taken every affirmative step possible in applying for legalization but were blocked because of the challenged regulations. The Court reasoned that because there were several criteria for determining whether an alien would be eligible for legalization, the plaintiffs could not show that they were "concretely affected" by the challenged regulations unless their applications had been denied "by virtue of the [challenged] rule, and not by virtue of some other, unchallenged rule." *CSS*, —— U.S. at —— n. 19, 113 S.Ct. at 2496 n. 19 (quotation marks omitted). Plaintiffs who could demonstrate that their applications were denied because of the rule would then be subject to IRCA's exclusive review provisions; as such, these plaintiffs could only raise their challenge to the questioned regulations as part of an appeal from an order of deportation.

The Court recognized an exception to this scheme of review for aliens who could show that they were "front-desked" by INS officials—*i.e.*, whose applications were rejected at INS offices on the basis that they were statutorily ineligible for legalization—or who could show that even though they were not front-desked, "the front-desking policy was nevertheless a substantial cause of their failure ... to apply." *CSS*, —— U.S. at —— n. 28, 113 S.Ct. at 2500 n. 28. The Court observed that these aliens would have ripe claims because they would have felt the regulations' effects concretely. Furthermore, they would be able to maintain an action in the district court because they would not come under IRCA's exclusive review procedures, which applied only to aliens whose applications had been denied in an administrative proceeding. Because the record was unclear as to whether any of the plaintiffs had been subjected to front-desking, the Court remanded for further factual findings.

When this case was remanded to this court, we in turn remanded it to the district court for a determination as to which, if any, of the plaintiff class members were front-desked or could otherwise show that the challenged regulations applied to them " 'in a sufficiently concrete manner to satisfy ripeness concerns.' " 4 F.3d at 100 (quoting CSS, —— U.S. at —— n. 28, 113 S.Ct. at 2500 n. 28). The parties subsequently petitioned for us to recall this mandate and to decide the questions we had not addressed in our first opinion. We granted their petitions and now proceed to rule on the merits of plaintiffs' unresolved claims.

## DISCUSSION

Plaintiffs assert three allegedly "procedural" claims which they argue are plainly ripe, are substantiated by the existing record, and warrant reinstatement of the relief ordered in our previous decision. Specifically, plaintiffs claim that the INS violated (a) its statutory duty to disseminate accurate eligibility information pursuant to 8 U.S.C. § 1255a(i); (b) its statutory duty to administer a 12–month application period pursuant to 8 U.S.C. § 1255a(a); and (c) the Due Process Clause of the Fifth Amendment.

### A. *Ripeness*

■ In their briefing to this court, plaintiffs have presented two distinct formulations of their procedural claims. The first formulation asserts that the INS disseminated unlawful eligibility requirements insofar as their substance contravened the statutory mandates of IRCA; the second asserts that the INS disseminated inaccurate eligibility requirements insofar as the information communicated contravened the actual practices INS agents followed when processing applications. We believe that the first formulation of plaintiffs' procedural claims is not ripe for review in light of CSS. Although CSS did not specifically address a dissemination or due process claim, the Court's overriding principle that there can be no pre-enforcement challenges to the validity of a regulation applies with equal force to a dissemination challenge that turns upon a determination of a regulation's validity. In other

words, plaintiffs cannot escape the reach of CSS by shifting their attack against the substance of the public charge regulations from the point when the INS promulgated them to the point when the INS disseminated them or the eligible aliens received them.

Plaintiffs seek to distinguish CSS on the grounds that the plaintiffs in CSS sought to enforce the INS's duty to adjudicate applications, whereas the class members in this case seek to enforce the INS's duty to disseminate accurate information. This argument is unavailing. Plaintiffs essentially assert a right to have disseminated to them only regulations that have been declared valid vis-a-vis the statute. However, neither IRCA nor the Due Process Clause gives rise to such a right. To hold otherwise would mean that potential applicants of any government program would be entitled to a court ruling on the validity of an agency's implementing regulations upon their mere dissemination and before the regulations were even enforced. Such a pre-enforcement ruling is exactly what CSS forbids.

■ By contrast, plaintiffs' second formulation of their procedural claims is ripe for adjudication. In essence, plaintiffs allege that the INS "publicized eligibility restrictions that it later jettisoned, and then failed to disseminate the changed eligibility standards," with the result that many eligible aliens were deterred from applying. These claims are not barred by CSS because they do not require a decision as to whether the substance of the INS's policies accord with the statute. They require only a determination regarding whether the information disseminated by the INS accorded with the practices it utilized for processing applications. As a result, the claim here is distinguishable from CSS. This claim is ripe because the plaintiffs allege that the agency failed to notify potential applicants of a change in the criteria for amnesty, thus deterring them from applying for amnesty. Consequently, the plaintiffs are challenging the lack of adequate notice rather than the substance of the policies.

The CSS Court hints at this distinction in a footnote, noting that the "end of the application period may mean that the plaintiffs no

longer have an opportunity to take the steps that could make their claims ripe; but this fact is significant only for those plaintiffs who can claim that the Government prevented them from filing a timely application." —— U.S. at —— n. 20, 113 S.Ct. at 2497 n. 20. While the Court was probably referring to plaintiffs who were front-desked, the latter clause also encompasses plaintiffs who were prevented from filing a timely application because they did not receive proper notice of the application criteria. Such claims were not ripe as long as the application period was open. Once that period closed, however, the claim became ripe because the plaintiffs were left with no opportunity to apply for amnesty. Thus, we hold that the challenge to the INS's failure to broadly disseminate changes in the eligibility requirements constitutes a ripe claim.

## B. *Due Process Claim*

We thus turn to the merits of plaintiffs' more purely procedural claims. As an initial point, we note that the standards for judging plaintiffs' claims are not well defined. IRCA provides simply that the INS must "broadly disseminate information respecting the benefits which aliens may receive under this section and the requirements to obtain such benefits." 8 U.S.C. § 1255a(i). The Fifth Amendment requires that no person be deprived of life, liberty, or property without due process of law. For purposes of our discussion, we assume that plaintiff class members have a protected interest in receiving amnesty based on IRCA's mandatory language that the Attorney General "shall" grant eligible aliens legalized status. *See Perales,* 762 F.Supp. at 1063–64; *see also McNary v. Haitian Refugee Ctr.,* 498 U.S. 479, 491, 111 S.Ct. 888, 895, 112 L.Ed.2d 1005 (1991) (the impact of a denial of legalization under special agricultural workers program is "plainly sufficient to mandate constitutionally fair procedures in the application process"); *cf. Holmes v. New York City Hous. Auth.,* 398 F.2d 262, 265 (2d Cir.1968) (finding that plaintiffs' complaint stated a claim for relief under the Due Process Clause where applicants for public housing under New York's Public Housing Law alleged deficiencies in the admission policies); *Dealy v.*

*Heckler,* 616 F.Supp. 880, 886 (W.D.Mo.1984) (finding that an applicant for Social Security benefits has a constitutionally protected property interest).

Due process requires that notice for proceedings be "of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (citations omitted). To determine reasonableness in this context, we must weigh

> the private interest that will be affected by the official action; ... the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

■ We note that the IRCA requirement of broad dissemination of information regarding "the benefits which aliens may receive ... and the requirements to obtain such benefits," 8 U.S.C. § 1255a(i), coupled with the legislative goal of reaching an uneducated and fearful alien population, sets a more stringent standard than the general due process notice requirements for potential recipients of government benefits. Thus, if the INS complied with its statutory duties of broad dissemination it also fulfilled its due process obligations.

Plaintiffs argue that the INS's initial regulations led the alien population to believe that a family member's receipt of public assistance would disqualify an applicant, and that the INS never effectively communicated to the alien population the policy statements clarifying this misperception. They further contend that the INS did not broadly disseminate its amendment of the regulatory special rule halfway through the application period, depriving class members of a full twelve months for submitting their applications. While our prior opinion tracked the develop-

ment of the INS's policies during the application period, we did not decide whether the INS had satisfied its dissemination obligations under IRCA or the Due Process Clause. *See Perales,* 967 F.2d at 802–03. We now hold that the INS's dissemination of information regarding the application process and relevant eligibility standards did not violate the class members' statutory and constitutional rights.

### 1. *The INS's Policy Regarding Public Cash Assistance*

■ We turn first to the INS's development of its policy regarding how receipt of public cash assistance would affect an applicant's eligibility for legalization. The INS's initial regulations stated that an applicant was subject to the public charge exclusion "unless the applicant demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance." 8 C.F.R. § 245a.2(d)(4) (1988). The regulations defined "public cash assistance" as "income or needs-based monetary assistance to include, but not limited to, supplementary security income received by the alien" or his or her immediate family members. 8 C.F.R. § 245a.1(i). Plaintiffs argue that these regulations created a categorical rule that a family member's receipt of public cash assistance would make an alien ineligible for amnesty. The INS maintains that under these regulations, an alien *might* be ineligible for amnesty due to his or her family members' receipt of public assistance, but that each applicant was reviewed on a case-by-case basis and could make a showing of self-support under the regulatory special rule notwithstanding a family member's receipt of public assistance. The district court credited the INS's position, finding that there was no *per se* rule of automatic disqualification based on a family member's receipt of public assistance. This was a finding of fact, which we review for clear error. Fed. R.Civ.P. 52(a).

Plaintiffs dispute the district court's finding by pointing to the testimony of Richard Berryman, the INS's New York Training Coordinator, who answered affirmatively when asked whether he had trained the le-

galization personnel in New York and the QDEs in New York that "mere receipt of public cash assistance by a United States citizen child of a legalization applicant at any time after January 1, 1982 per se rendered the parent likely to become a public charge." The INS responds that Berryman also testified that there were no clear-cut rules regarding eligibility, and that public charge waivers were available from the start of the amnesty program. The INS further argues that any misperception Berryman might have communicated was minimal since his last training session was in September, 1987 and the November, 1987 amendment to the regulatory special rule clarified that receipt of welfare by an applicant's family member was not a categorical bar to legalization. In addition, other INS trainers gave directions to the effect that "the test for public charge [was] a prospective one and that it [was] only necessary to show reasonable employment which [was] current."

While the district court did not discuss the intricacies of this evidence, it clearly rejected plaintiffs' claim that the INS adopted a *per se* rule of automatic disqualification based on a family member's receipt of public assistance. *Perales,* 762 F.Supp. at 1065. The court specifically observed that the aliens' testimony to the contrary was "generalized, amorphous, and remarkably redundant." *Id.* The district court found it significant that, in contrast to plaintiffs' assertion that many believed there was a *per se* rule of disqualification, the INS processed and approved numerous applications of aliens whose family members were receiving public assistance or who were receiving public assistance themselves. Our review of the record does not indicate that the district court's finding regarding the INS's policy was clearly erroneous. While conflicting testimony may have been presented in the lower court, we are not left with a "definite and firm conviction that a mistake has been committed." *Sumner v. United States Postal Serv.,* 899 F.2d 203, 208 (2d Cir.1990) (internal quotations and citation omitted).

Further demonstrating that there was no *per se* rule of automatic disqualification based on a family member's receipt of public assis-

tance were the INS's two policy statements issued during the course of the application period regarding the operation of its public charge regulations. By memorandum dated November 23, 1987, the INS Commissioner notified the agency's four regional offices that SSI received by an applicant's family member would not be attributed to the applicant, and by memorandum dated April 21, 1988, he notified the regional offices that AFDC benefits received by an applicant's family member would only be attributed to the applicant if it was her sole means of support. In our view, these policy statements represent a clarification, not a change, of the INS's overall policy. That is, both before and after the issuance of these statements, aliens who received public assistance might be ineligible for amnesty, but they could nonetheless show evidence of self-support or apply for a waiver. The policy statements merely explained in more detail when the receipt of public assistance by a family member might demonstrate the alien's likelihood of becoming a public charge. Under the clarified regulations, an alien might still be disqualified in some instances if a family member received public assistance. Thus, the issuance of these policy clarifications did not change the fact that an alien's individual circumstances, including the nature of certain public assistance awards to family members, was relevant to the determination of the alien's ability to support herself.

■ The factual finding that there was no *per se* rule prohibiting aliens from being granted amnesty on the basis of a family member's receipt of public assistance supports our legal conclusion that the INS's policy was broadly disseminated. Although the INS's initial regulations may have been awkwardly drafted, they placed aliens on sufficient notice of the requirements to obtain amnesty under IRCA, as required by 8 U.S.C. § 1255a(i), and of the rules and standards for receiving newly-created benefits, as required by the Due Process Clause. To the extent the regulations may have engendered questions regarding a particular applicant's eligibility, the alien could have submitted an application to determine her eligibility and, in the process, challenged the application of any regulation. Alternatively, the alien could

have presented her inquiries to the regional INS office. Plaintiffs' argument that the INS should have pre-determined, at the point when it was promulgating its initial regulations, how the regulations would apply in their particular circumstances holds the INS to a standard of detail and precision that is simply not required either by IRCA or the Due Process Clause.

The INS's decision to amend the public charge regulations after the application period had passed in order to delete references to an applicant's family members is not relevant to our decision. Those amendments were made after the application period and therefore did not affect eligibility standards during the application period. Plaintiffs' procedural claims are based on the premise that the INS adopted different internal eligibility criteria than those disseminated to the alien population, thereby dissuading them from applying. Accordingly, any changes made to the criteria after the application period had ended cannot serve as the basis for plaintiffs' procedural claims.

### 2. *The INS's Amendments Regarding Waiver Applications*

■ The other policy development challenged by plaintiffs was the INS's decision to amend the regulatory special rule so that aliens who showed evidence of self-support under the rule did not have to file a separate waiver application. While this decision may have constituted a substantive change in INS policy, the INS communicated the new rule to the four regional offices in September of 1987 and issued a technical amendment revising the regulatory special rule in November of 1987. Plaintiffs claim that because this revision came six months into the application period and was not widely communicated to the alien population directly, the INS violated its duties to disseminate pertinent information broadly and to sponsor a full twelve-month application period.

However, we believe that plaintiffs again attempt to hold the INS to too strict a standard. The IRCA does not define how broadly the INS must disseminate information relevant to the application process. It is undis-

puted that the INS's initial regulations were widely communicated within the agency and to the public through radio and television broadcasts, literature, and outreach programs. The INS subsequently communicated its change as to the operation of the regulatory special rule within the agency through a memorandum sent to the four regional offices and to the public through publication in the Federal Register. We cannot say that further outreach regarding this amendment was required by either IRCA or due process. Nowhere in IRCA is there a mandate that the INS must undertake a media campaign regarding revisions to the application process. Under the circumstances, we find that the INS more than fulfilled the broad dissemination requirement by publishing these changes in the Federal Register. First, the INS had already made great efforts to inform the alien population of the amnesty program. Second, under the statutory framework, QDEs were made widely available to reach a population that would otherwise be fearful of the INS. Thus, publications in the Federal Register indicating revisions in the application process were disseminated to the alien population via the QDEs. We note, without deciding, that had no QDEs existed, given the special nature of the potential beneficiaries, publication in the Federal Register might not have been sufficient to satisfy the broad dissemination requirement. However, under the circumstances here, we hold that the INS fulfilled its statutory duties.

██ Given that the due process notice standard is even lower than the IRCA broad dissemination requirement, the INS also complied with its constitutional obligations. Due process cases have long recognized that publication in the Federal Register constitutes an adequate means of informing the public of agency action. *See, e.g., Lyng v. Payne,* 476 U.S. 926, 942–43, 106 S.Ct. 2333, 2343, 90 L.Ed.2d 921 (1986). Thus, we hold that the INS fulfilled its statutory and constitutional duties with regard to providing notice to the aliens of the clarifications and revisions of the application criteria.

██ We also reject plaintiffs' argument that the INS's revision of the special regula-

tory rule violated its duty to sponsor a twelve-month application period. The twelve-month period required by IRCA referred to the time frame for accepting applications. The INS satisfied this statutory obligation by accepting applications from May 5, 1987 to May 4, 1988. There is no provision in IRCA requiring the INS to restart the application period any time it issues amendments to the rules for processing applications or clarifications of its standards for adjudicating applications. We thus affirm the district court's decision that the INS did not breach its duties under IRCA or the Constitution to disseminate information to undocumented aliens and to sponsor a full twelve month application period.

We must nonetheless remand this case, as we initially decided to do, to determine whether plaintiffs' claim challenging the validity of the public charge regulations is ripe as to any of the plaintiffs in light of *CSS.* On remand, the district court must determine whether any of the plaintiffs were "front-desked" or can otherwise "demonstrate that the front-desking policy was ... a substantial cause of their failure ... to apply." *CSS,* — U.S. at —— n. 28, 113 S.Ct. at 2500 n. 28. We reject the INS's argument that a remand is unnecessary because it did not employ any front-desking policy or otherwise impede class members from filing applications. Ruling on such an issue would improperly require us to delve into factual issues that should be decided in the first instance by the district court.

We also reject the INS's argument that the district court already decided this issue. The district court found only that the plaintiffs who testified at trial did not take "any affirmative, conscientious step to actually file an application" and that no person had "come forth during this entire case and alleged that he or she was turned away at an INS legalization office because he or she had a welfare-dependent child." *Perales,* 762 F.Supp. at 1070. These statements do not foreclose the possibility that the plaintiff class includes members who were in fact front-desked. Although plaintiffs conceded at oral argument that the search for a front-desked class member may not prove fruitful, we cannot dis-

pense with such an inquiry. Finally, we decline to rule on the issue of whether the governmental plaintiffs have standing and instead leave this issue, which has not been ruled on to date, to be decided in the first instance by the district court if necessary.

## CONCLUSION

For the foregoing reasons, we affirm that portion of the district court's judgment that held that the INS satisfied its duty to disseminate accurate information regarding the amnesty program and remand for further proceedings as to plaintiffs' facial challenge to the public charge regulations.

CARDAMONE, Circuit Judge, dissenting in part:

Respectfully, I dissent.

If there is a modern-day counterpart to Dickens' "Circumlocution Office" the INS most nearly fits that role. Through its delicate perception, through its tact, and through the genius with which it acted, "the Circumlocution Office was beforehand with all the public departments in the art of perceiving— HOW NOT TO DO IT." Charles Dickens, *Little Dorrit (Part One)* 128 (Peter Fenelon Collier & Son 1900).

## BACKGROUND

A brief examination of recent accounts concerning the INS will demonstrate the validity of the comparison. As reported in the public press, the INS is found by those who deal with it to be "cold, rude, insensitive, and inefficient," not answering phone calls or letters, making clients wait for hours in lines, taking years to admit its own errors and years more to correct them. *See* Deborah Sontag & Stephen Engelberg, *Insider's View of the I.N.S.: "Cold, Rude and Insensitive,"* N.Y. Times, Sept. 15, 1994, at A1, A18. Even the Attorney General herself was unable to get through by phone to the INS, an agency that is part of the Justice Department, which she heads. *Id.*

"The I.N.S. is completely like a Soviet bureaucracy," said Leonid Zagalsky, 39, a Russian immigrant in New York. "Every sign starts with the word 'no': No smoking. No standing. No sitting. No asking questions. You cannot reach a human being by phone. And when you go, you stand for many humiliating hours in line only to reach a semi-human who answers your measly question by talking in a cabalistic language: 'I–95, dash, point 6, dash, B–52.'" (Mr. Zagalsky was referring to the agency's complex numbered forms.) *Id.* This experience is not surprising. Immigration officers are trained to be rude and arrogant. During basic training, an assistant district director of INS in Chicago is quoted as saying, "we historically have told our employees that it's our job to keep [immigrants] out and our job to keep [immigrants] from getting benefits." *Id.* The INS has also been described as one of the government's "most troubled agencies," and is known for promoting misbehaving agents under a policy of "Screw up—Move up." Stephen Engelberg & Deborah Sontag, *Behind One Agency's Walls: Misbehaving and Moving Up,* N.Y. Times, Dec. 21, 1994, at A1, D22.

In light of this publicly catalogued attitude—contrary to and contemptuous of the fair administration of the laws of the United States—it is hardly surprising that one of the reasons this panel originally ruled in favor of the plaintiffs was because we concluded that the INS had added its own requirement to those Congress had established for eligibility for immigrants to obtain legal status. To Congress' requirement that the applicant "evidenc[e] self-support without receipt of public cash assistance," 8 U.S.C. § 1255a(d)(2)(B)(iii) (1988 & Supp. V 1993), the agency added its own regulatory requirement that the applicant must demonstrate the capacity to "maintain his or her family without recourse to public-cash assistance." 52 Fed.Reg. 16,212 (1987). For self-supporting illegal immigrants whose family members received public cash assistance, this additional requirement essentially closed the door to legalized status that Congress had opened for them. This regulation is a perfect paradigm of the agency's penchant for perceiving "HOW NOT TO DO IT."

## DISCUSSION

In dealing with a complex immigration situation, Congress determined that the nation

would best be served by granting amnesty to many otherwise illegal aliens and permitting them to obtain legal resident status. To accomplish this it passed the Immigration Reform and Control Act of 1986 (IRCA), Pub.L. No. 99–603, 100 Stat. 3359 *et seq.* In executing the expressed intent of Congress to benefit this immigrant group, the INS failed in numerous ways. Taken as a whole, the string of failures constitutes an outrageous course of conduct that effectively denied these plaintiffs the one-year application period Congress had granted them. On the open road Congress paved to lead smoothly to legal status for the illegal alien population, the INS, as part of its own exclusionary policy towards immigrants, put up a roadblock preventing members of the plaintiff class from reaching their highly prized destination.

Specifically, as part of IRCA, Congress issued a mandate to the INS directing it to "broadly disseminate information respecting the benefits [i.e., legal status] which aliens may receive ... and the requirements to obtain such benefits." 8 U.S.C. § 1255a(i) (1988). While the INS' failure to comply with this mandate due to its dissemination of inaccurate information is only one of the wrongs alleged by the plaintiffs, I recognize, in light of *Reno v. Catholic Social Services,* — U.S. ——, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993), that only this challenge regarding the accuracy of the disseminated information is ripe for adjudication.

My respected colleagues accept the district court's factual finding that the INS never had a *per se* rule with respect to the eligibility of aliens whose family members received public cash assistance. According to the majority, this finding supports their "legal conclusion" that the INS met its dissemination obligation. While conceding that the public charge regulations were "awkwardly drafted," the majority believes that they provided sufficient and accurate notice of the standards for legalization. These legal conclusions are based, in large part, on the fact that the INS received and approved numerous applications of such aliens. The INS policy expressed in its regulations, according to the majority, means only that "an alien

*might* be ineligible for amnesty due to his or her family members' receipt of public assistance," Maj. Op. at 1314, but that each decision with respect to eligibility was made on a case-by-case basis. The majority further believes that when immigrants were uncertain as to whether their circumstances fit within the public charge regulations, they were free to apply for a change in legal status, apply for a waiver if necessary, and upon denial of legalization challenge the regulations in court. Thus, the majority holds that the INS satisfied its obligation of broad dissemination under IRCA.

This analysis misses the mark by a wide margin. The majority errs in treating the INS' compliance with Congress' mandate as a question that can be resolved by examining how some illegal aliens actually interpreted the regulations. Its conclusion that the disseminated information did not contain a *per se* rule is based on the district court's finding that many aliens whose family members had received public cash assistance applied for legalization. According to the majority such applications showed the immigrant population was not misled by the public charge regulations as to the real INS policy. But that some members of the immigrant community decided to take a chance on applying does not compel a determination that the disseminated information was adequate as a matter of law. The question is whether the information disseminated to the intended beneficiaries of IRCA adequately put them on notice that the INS had a flexible case-by-case approach or whether it instead conveyed the notion that application was as a practical matter a waste of time for all those whose family members received public cash assistance.

The resolution of this legal question rests solely with a reading of the public charge regulations to determine what information they conveyed. The regulations state that "[a]n applicant ... [is] likely to become [a] public charge[ ] unless the applicant demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance.... An applicant for residence who is likely to become a public charge will be denied adjustment." 52

Fed.Reg. 16,211 (1987) (codified as amended at 8 C.F.R. § 245a.2(d)(4) (1992)). "Public cash assistance" is defined as "income or needs-based monetary assistance ... received by the alien or his or her immediate family members...." 52 Fed.Reg. 16,209 (1987) (codified as amended at 8 C.F.R. § 245a.1(i) (1992)). The plain meaning of these two prongs of the public charge regulations taken together is that immigrants whose family members receive public cash assistance are ineligible for legalization and hence need not apply for the benefit Congress conferred upon them.

The message conveyed by the public charge regulations becomes murky when one moves on to the third prong of the regulations—the "regulatory special rule." That rule provides that an immigrant with a "consistent employment history which shows the ability to support himself and his or her family ... may be admissible" through a discretionary waiver from the Attorney General *for humanitarian purposes, to assure family unity, or when in the public interest;* that "[p]ast acceptance of public cash assistance ... will enter into [the Attorney General's] decision;" and that "the length of time an applicant has received public cash assistance will constitute a significant factor [in that decision]." 52 Fed.Reg. ·16,212 (1987) (codified as amended at 8 ·C.F.R. § 245a.2(k)(4) (1992)).

A common sense reading of the regulatory special rule shows that the waiver is not described as a broad-based abrogation of the public charge regulations. Rather, it is worded as an exception to the public cash assistance disqualification, for the limited purpose of avoiding unduly harsh consequences. The references to the role that public cash assistance plays in the Attorney General's decision strongly imply that receipt of such assistance, except in unusual circumstances and for minimal periods of time, will weigh against receipt of a waiver by an applicant. In effect, the waiver amounts to no more than a possible pardon, if such is the sovereign's pleasure.

A reading of the INS' summary of the key provisions of the public charge regulations, published in the Federal Register with the final regulations, corresponds to a reading of the regulations such that immigrants whose family members receive public cash assistance would generally be ineligible for legalization. The INS stated that "numerous commenters raised the concern that [the public charge regulations] may deny legalization benefits if public cash assistance was received by United States citizen children of legalization applicants. The position of INS is that the statute is clear regarding this subject and applicants may in fact be ineligible for legalization if such cash assistance was received by their U.S. citizen child." 52 Fed.Reg. 16,207 (1987).

While it is noteworthy that, in response to these comments, the INS modified the final rule to allow for the just recited waiver, the scope of the waiver—humanitarian purposes, family unity, public interest—does not invite waiver applications from the vast majority of immigrants excluded by the public charge regulations from the benefit of legalization that Congress conferred upon them. That a number of them successfully applied for waivers does not alter the legal conclusion drawn from a plain reading of the regulatory special rule and the public charge regulations as a whole. It seems obvious that a large number of the plaintiff class would have applied for legal status had not the INS disseminated information conveying the notion that it was futile to apply.

Congress did not plan for the INS to disseminate what would appear to laypersons to be a broad restriction on eligibility, and then rely on rumor or word-of-mouth—among what the majority itself characterizes as "an uneducated and fearful alien population"—to negative the restriction by telling these wary immigrants that, contrary to the disseminated information, the INS policy is really "maybe yes, maybe no, try your luck." As earlier observed, the INS' basic training course teaches its agents how to keep immigrants out and how to deny them benefits to which they are legally entitled. The basic training worked superbly in the case of the rights granted immigrants under IRCA because the INS' failure to accurately describe the requirements for legalization effectively excluded nearly the entire plaintiff class.

CONCLUSION

In my view the regulations promulgated by the INS failed as a matter of law to reasonably inform these mostly working mother immigrants with U.S. citizen children of information necessary for them to realize they were potentially eligible for legalization, in violation of IRCA's broad dissemination requirement, 8 U.S.C. § 1255a(i). As a result, this six-year-old litigation is culminating in an unjust judgment against the plaintiff class, consigning them to a marginal life and subjecting them to deportation and separation from their U.S. citizen children. Even if these working, long-term residents of the U.S. escape deportation, the present denial of the opportunity to obtain legal status condemns them to a limbo where they may no longer be able to find employment and effectively places their children on welfare. From which injustices, Congress meant to free them.

Accordingly, I vote to grant the relief the panel granted in its earlier decision requiring the INS to disseminate information consistent with the will Congress expressed in IRCA and opening the window of opportunity for members of plaintiffs' class for a one-year period. *See Perales v. Thornburgh,* 967 F.2d 798, 814–15 (2d Cir.1992).